UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAN HOWITT,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SOMERVILLE HOUSING AUTHORITY; and MCCRIGHT ASSOCIATES,<br><br>    Defendants. | Civil Action No. 1:25-cv-11896-IT |

MEMORANDUM

February 6, 2026

TALWANI, D.J.

On January 30, 2026, this court GRANTED Defendant U.S Department of Housing and Urban Development's ("HUD") Motion to Dismiss [Doc. No. 21] Plaintiff Dan Howitt's Amended Complaint [Doc. No. 6-1] and DENIED, as to HUD, Plaintiff's Motion for Leave to File a Second Amended Complaint [Doc. No. 63]. See Electronic Order [Doc. No. 76]. This Memorandum sets forth the grounds for the court's order.

**I.    Procedural Background**

On June 3, 2025, Plaintiff, proceeding *pro se*, filed his original Complaint [Doc. No. 1-3] against Defendants in Suffolk Superior Court. On June 12, 2025, Plaintiff filed an Amended Complaint [Doc. No. 6-1]. On July 3, 2025, HUD removed the case to federal court pursuant to 28 U.S.C. § 1442(a)(1). Notice of Removal 1 [Doc. No. 1].

Plaintiff alleges HUD violated the following federal and state laws and regulations: 24 C.F.R. § 982.503(d)(5); 42 U.S.C. § 1437f(o)(1)(d); 42 U.S.C. § 12132; and M.G.L. c. 272 § 98. See Am. Compl. ECF 13–15, ¶¶ 45–48 [Doc. No. 6-1].

HUD moves to dismiss Plaintiff's claims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), where Plaintiff lacks standing and the United States has not waived sovereign immunity over any of Plaintiff's claims, and for failure to state a claim under Rule 12(b)(6). Def.'s Mot. to Dismiss [Doc. No. 21]; Def.'s Mem. ISO of Mot. to Dismiss 1–2 [Doc. No. 22].

After briefing on HUD's motion was complete, Plaintiff moved to amend his Amended Complaint. See Mot. for Leave to File a Second Am. Compl. [Doc. No. 63].

As set forth above, the court, by electronic order, granted HUD's motion to dismiss, and denied, as to HUD, Plaintiff's motion for leave to amend, with this memorandum to follow. See Electronic Order [Doc. No. 76].

Because the court dismisses Plaintiff's claims for lack of standing, this memorandum does not address Defendant's motion as to sovereign immunity or failure to state a claim under Fed. R. Civ. P 12(b)(6).

**II.    Standard of Review**

   A.    *Motion to Dismiss for Lack of Standing*

Rule 12(b)(1) is "[t]he proper vehicle for challenging a court's subject matter jurisdiction." Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362 (1st Cir. 2001). A motion to dismiss for lack of constitutional standing is properly brought as a challenge to the court's subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). See Katz v. Pershing, LLC, 672 F.3d 64, 75 (1st Cir. 2012). Federal courts are courts of limited jurisdiction, so federal jurisdiction is never presumed. Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998).

The party asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction. Id. A court should treat all well-pleaded facts as true and provide the plaintiff the benefit of all reasonable inferences. Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009). Dismissal is appropriate only when the facts alleged in the complaint, taken as true, do not support a finding of federal subject matter jurisdiction. Id. A challenge to the court's subject matter jurisdiction must generally be addressed before addressing the merits of a case. See Acosta-Ramirez v. Banco Popular de Puerto Rico, 712 F.3d 14, 18 (1st Cir. 2013).

The doctrine of standing is rooted in Article III of the Constitution, which confines federal courts to the adjudication of actual "cases" and "controversies." See U.S. Const. Art. III, § 2, cl. 1; Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (quoting Lujan, 504 U.S. at 560-61). "The standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012) (citing Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006)).

To establish the first element of standing, an injury-in-fact, a plaintiff must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. "The particularization element of the injury-in-fact inquiry reflects the commonsense notion that the party asserting standing must not only allege injurious conduct attributable to the defendant but also must allege that he, himself, is among the persons injured by that conduct." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731-32 (1st Cir. 2016).

3

The second element, traceability, "requires the plaintiff[s] to show a sufficiently direct causal connection between the challenged action and the identified harm." In re Evenflo Co., 54 F.4th 28, 34 (quoting Katz, 672 F.3d at 71). And to show redressability, the third element, the plaintiff must demonstrate that favorable resolution by the court would remedy the alleged injury. Id.

"The 'traceability' or causation element 'requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm,'" Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 47 (1st Cir. 2020) (quoting Katz, 672 F.3d at 71), but does not require the plaintiff to show proximate causation, Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 134 n.6 (2014). The injury must be "fairly…traced to the challenged action of the defendant, and not injury that results" from another party. Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41–42 (1976). "[T]he plaintiff must show a predictable chain of events leading from the government action to the asserted injury." FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367, 385 (2024).

Because standing is not a "mere pleading requirement[] but rather an indispensable part of the plaintiff's case," standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561; see also People to End Homelessness v. Develco Singles Apartments Assoc., 339 F.3d 1, 8 (1st Cir. 2003). While at the pleadings stage, "general factual allegations of injury" may suffice, and at summary judgment, such allegations must be supported by affidavits which will be taken to be true, where standing remains a controverted issue at trial, the specific facts establishing standing "must be 'supported adequately by the evidence adduced at trial.'" Id. (quoting Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 114, 115 n.31 (1979)).

4

B.    *Motion to Amend*

A party may amend its pleadings once as a matter of course within twenty-one days of serving it or within twenty-one days after service of a responsive pleading or Rule 12 motion. Fed. R. Civ. P. 15(a). In all other cases, a party may amend its pleading only with the consent of the other party or leave of the court. Id.

Under Federal Rule of Civil Procedure 15(a), leave to amend a pleading shall be freely granted "when justice so requires." Nevertheless, a motion for leave to amend may be denied in cases of (1) undue delay, (2) bad faith or dilatory motive, (3) undue prejudice, or (4) futility of amendment. See Foman v. Davis, 371 U.S. 178, 182 (1962).

When leave to amend is sought before discovery is complete, and neither party has moved for summary judgment, futility is typically gauged by the same standard as legal sufficiency under Rule 12(b)(6). See Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 19 (1st Cir. 2001). However, "a futility finding could also mean that the proposed complaint would require dismissal for other reasons, such as lack of subject-matter jurisdiction under Rule 12(b)(1)." D'Agostino v. ev3, Inc., 845 F.3d 1, 6 n.3 (1st Cir. 2016).

**III.    Factual Background as Alleged in the Complaint**

Plaintiff, Dan Howitt, is a resident of Massachusetts and a recipient of a Section 8 Housing Choice Voucher ("HCV"). Am. Compl. ECF 1–2, 6 [Doc. No. 6-1].

The HCV Program is funded by the Defendant, the U.S. Department of Housing and Urban Development ("HUD"), and administered by Public Housing Authorities ("PHAs"). 24 C.F.R. § 982.1(a)(1) ("The HCV program is generally administered by State or local governmental entities called public housing agencies (PHAs). HUD provides housing assistance funds to the PHA."). Plaintiff alleges that Defendant Somerville Housing Authority ("SHA") is the public housing authority that administers his voucher. Am. Compl. ECF 4, ¶¶ 17–18 [Doc.

No. 6-1] (noting that Plaintiff sought to have his case transferred from the Somerville Housing Authority to the Cambridge or Boston housing authority).

Plaintiff alleges that, since 2023, he has sought to move from his current housing arrangement to one that can better accommodate his disability and medical needs. Id. at ECF 3, ¶ 4.[1] Additionally, Plaintiff has sought to move on account of his relationship with his current landlord, who, Plaintiff alleges, committed abuses against Plaintiff. Id. at ECF 3, ¶ 4a.

Plaintiff alleges that he found a one-bedroom unit available at the Kendall Hotel in Cambridge, MA. Id. at ECF 2, Facts, ¶ 1. In December 2024, Plaintiff, having contacted SHA and HUD regarding his medical needs, submitted a request to SHA for approval of the one-bedroom unit. Id. Plaintiff alleges that he explained in his emails to SHA and HUD that the hotel would better accommodate his needs, including being within walking distance of Massachusetts General Hospital, having an apartment with carpeting to dampen noise, and being fully furnished. Id.

Plaintiff states that the operator of the one-bedroom unit seeks a monthly rent of $5,500. Id. at ECF 4, ¶ 12. Plaintiff asserts further that SHA had previously granted Plaintiff an "exception payment standard" for 120 percent of the applicable Fair Market Rate ("FMR"), but that the amount allowed by this exception was well below $5,500. Id. at ECF 3, ¶ 6. Plaintiff alleges that in May 2025, SHA replied that Plaintiff's request to live in the one-bedroom unit was "not reasonable." Id. at ECF 4, ¶ 9.[2] Plaintiff claims that the Cambridge and Boston Housing

---

[1] Plaintiff states that he is diagnosed with "Autism Spectrum Disorder . . ., marked Major Depressive Disorder . . ., and marked Post Traumatic Stress Disorder . . . secondary to chronic disability based social abuse." Am. Compl. ECF 2, Introduction, ¶ 1 [Doc. No. 6-1].

[2] Part of the approval process for a unit is a determination that the rent is reasonable as to comparable units in the area. 42 U.S.C. § 1437f(o)(10)(a) ("The rent for dwelling units for which a housing assistance payment contract is established under this subsection shall be reasonable in

Authorities each have a higher payment standard system than that of SHA. Id. at ECF 4, ¶ 17. For this reason, Plaintiff allegedly made multiple requests for his case to be transferred to either of the two other housing authorities. Id. at ECF 4, ¶ 18. Plaintiff alleges SHA declined to approve the transfer. Id.

Plaintiff alleges that because SHA declined Plaintiff's request for the one-bedroom unit, on May 6, 2025, he filed a request for approval of a studio unit at the Kendall Hotel instead. Id. at ECF 5, ¶¶ 19–20. The studio unit had a monthly rent of $4,100. Id. Plaintiff alleges that SHA has failed to approve Plaintiff's application for the studio unit. Id. at ECF 5, ¶ 28 (noting that, as of the filing of the Amended Complaint [Doc. No. 6-1], SHA had not replied to Plaintiff's request to modify the unit for it to comply with SHA requirements).

On May 8, 2025, while Plaintiff's request for the studio unit was pending, Plaintiff contacted Terri A. Green, a Portfolio Management Specialist in HUD's Boston office. Pl.'s Mem. in Opp'n Ex. 1, at ECF 5–6 [Doc. No. 26]. In his email, Plaintiff asked for his complaint regarding SHA's actions to be forwarded to "who oversees HUD Boston and SHA." Id. at ECF 5. Plaintiff alleges that Green informed him that SHA was responsible for determining whether Plaintiff could rent the apartment in the hotel. Am. Compl. ECF 4, ¶ 12 [Doc. No. 6-1]. As to Plaintiff's request that she forward his concerns to the director of HUD Boston, Green replied that "she is the only appropriate person at HUD Boston for [Plaintiff] to contact, and that there is no director for [Plaintiff] to convey [his] matter to." Id. at ECF 7, ¶ 37. Around this time Plaintiff additionally contacted Kara Norman—who, Plaintiff alleges, is a director with HUD Boston. Id. at ECF 7, ¶ 34. Plaintiff states that on May 21, 2025, Kara Norman replied to Plaintiff's email

---

comparison with rents charged for comparable dwelling units in the private, unassisted local market.").

explaining the procedure for HUD to approve an exception payment standard greater than 140%. Id. Norman reportedly advised him that an "exception payment standard request is submitted by the PHA [Public Housing Agency] to the field office. We do the initial review and the[n] submit to HQ [HUD Headquarters] for a final decision." Id.

Plaintiff asserts that SHA never submitted a formal request to HUD Boston. Id. at ECF 8, ¶ 42 ("SHA, and HUD Boston, intentionally maliciously failed to follow the above protocol. HUD Boston's Valerie Tucker stated to SHA that SHA failed to submit a formal (meaning complete) request that includes the above; and SHA never did."); id. at ECF 3, ¶ 7 ("SHA did not provide a proper disability based reasonable accommodation requests to HUD Boston. . . . I asked SHA for HUD Boston's emails to them about SHA's requests, and the emails show that SHA did not . . . provide a 'formal' request.").

Plaintiff seeks to assert additional allegations against HUD in a proposed Second Amended Complaint. See Mot. for Leave to File a Second Am. Compl. [Doc. No. 63]. Plaintiff contends that, over multiple weeks, Plaintiff contacted Terri Green, Kara Norman, and a third individual, Maura O'Brien, who Plaintiff alleges is the "supervisor division director," regarding SHA's alleged violations. Id. ¶ 2. Plaintiff alleges Green and Norman replied and "illegally interpreted" 24 CFR 982.507(b)(1)(2), claiming it did not account for any disability or medical requirements. Id. Plaintiff further alleges that in communications with HUD's attorney, Shauna Yen, Yen told Plaintiff that HUD approved of SHA's interpretation of the above regulation and how they administered the regulation. Id. Finally, Plaintiff seeks to reiterate in his proposed Second Amended Complaint that SHA did not send HUD a Disability Reasonable Accommodation Request for 140% approval. Id. ¶ 6.

## IV.  Discussion

HUD contends Plaintiff lacks standing to bring suit because he cannot establish that his injuries are fairly traceable to HUD. The court agrees and further finds that granting Plaintiff's Motion for Leave to File a Second Amended Complaint [Doc. No. 63] would be futile as to the new allegations he raises against HUD.

Plaintiff alleges that he has been injured by SHA and HUD

> via their intentional unwillingness, via their disability discrimination, to accept that I am disabled, elected to evade the correct procedure regarding my circumstance, lie to me about what the procedure is, and handle the matter themselves (including HUD Boston letting SHA inappropriately handle matters that HUD Boston should have forwarded to HUD Headquarters) for the purpose of discriminatorily subverting my life.

Am. Compl. ECF 8, ¶ 44 [Doc. No. 6-1]. Plaintiff claims that as a result of these actions, SHA and HUD have failed to process his "emergency and disability based requests to live at the Kendall Hotel[.]" Id. ECF 2, Introduction, ¶ 2 [Doc. No. 6-1]. Plaintiff asserts that this failure has resulted in Plaintiff being unable to move out of his current apartment where, he alleges, he is in an "emergency circumstance of persistent multifaceted abuse" by his landlord. Id.; id. at ECF 3, ¶ 4a. The court makes no determination on whether this is an actual or imminent injury for purposes of standing. Even if these allegations rise to an injury in fact for purposes of standing, Plaintiff fails to allege facts to establish that this alleged injury is fairly traceable to HUD.

The HCV Program is a public program funded by HUD but generally administered by state and local public housing agencies like SHA. 24 CFR § 982.1(a)(1) ("The HCV program is generally administered by State or local governmental entities called public housing agencies (PHAs). HUD provides housing assistance funds to the PHA. HUD also provides funds for PHA administration of the program."). Under the program terms, once an HCV recipient

selects a unit that meets the program's housing quality standards, it is up to the PHA to "approve[] a family's unit and tenancy[.]" 24 CFR § 982.1 (a)(2); see also 24 CFR §§ 982.4, 5.403 (defining family as "[a] person or group of persons," including "[a] single person, who may be … [a] disabled person"). If the apartment is approved, "the PHA contracts with the owner to make rent subsidy payments on behalf of the family." 24 CFR § 982.1(a)(2). The regulations place some limits on PHAs, for example, "[a] PHA may not approve a tenancy unless the rent is reasonable." Id. HUD is not involved in initial tenancy approval decisions. See Robbins v. United States Dep't of Hous. & Urb. Dev., 72 F. Supp. 3d 1, 7 (D.D.C. 2014), aff'd sub nom. Robbins v. Castro, No. 14-5298, 2015 WL 3372527 (D.C. Cir. May 6, 2015) ("HUD is not a party to the housing assistance contracts of Section 8 participants.").

The PHA is also responsible for setting the payment standards for each fair market rent ("FMR") area in the PHA's jurisdiction. 24 C.F.R. § 982.503(b). "These payment standard amounts are used to calculate the monthly housing assistance payment for a family." Id. The basic payment standard amounts must be between "90 percent up to 110 percent of the published FMR for a unit size." 24 C.F.R. § 982.503(c). However, an exception payment standard amount may be established in certain instances only after a request is first made to HUD. 24 C.F.R. § 982.503(d)(5).

Defendant contends that Plaintiff's claimed injury is not fairly traceable to HUD because the agency "has no role in determining the rent reasonability of Plaintiff's chosen housing unit and has no oversight responsibility over the Somerville Housing Authority's determination that Plaintiff's choice of a one-bedroom apartment . . . is not rent reasonable." Def.'s Reply in Further Supp. of Its Mot. to Dismiss the Am. Compl. 2 ("Def.'s Reply") [Doc. No. 30].

10

As Plaintiff acknowledges in his Amended Complaint [Doc. No. 6-1], SHA is the PHA that administers his voucher under the HCV program. Am. Compl. ECF 4, ¶¶ 17–18 [Doc. No. 6-1]. Accordingly, pursuant to the regulatory scheme, it is SHA, not HUD, that is responsible for making decisions regarding whether the requested one-bedroom unit at the Kendall Hotel is rent reasonable or not. Likewise, SHA is responsible for determining whether an apartment otherwise meets program requirements. Thus, even if Plaintiff suffered an injury when SHA denied, or in the case of the studio unit did not approve, his request, this injury cannot be traced to any action or inaction by HUD.

Plaintiff contends that HUD's actions violated 42 U.S.C. § 1437f(o)(1)(D) and a related regulation, 24 C.F.R. § 982.503(d)(5). Id. at ECF 14, ¶¶ 45–46. Yet, both the statute and regulation confirm that the actions contributing to Plaintiff's alleged injury cannot be traced to HUD. 42 U.S.C. § 1437f(o)(1)(d)) establishes that:

> The Secretary may require a public housing agency to submit the payment standard of the public housing agency to the Secretary for approval, if the payment standard is less than 90 percent of the fair market rental or exceeds 110 percent of the fair market rental, except that a public housing agency may establish a payment standard of not more than 120 percent of the fair market rent where necessary as a reasonable accommodation for a person with a disability, without approval of the Secretary. A public housing agency may use a payment standard that is greater than 120 percent of the fair market rent as a reasonable accommodation for a person with a disability, but only with the approval of the Secretary.

42 U.S.C. § 1437f(o)(1)(D) (emphasis added). 24 C.F.R. § 982.503(d)(5) establishes similar requirements, stating that:

> If required as a reasonable accommodation in accordance with 24 CFR part 8 for a person with a disability, the PHA may establish, without HUD approval or prior notification to HUD, an exception payment standard amount for an individual family that does not exceed 120 percent of the applicable FMR. A PHA may establish a payment standard greater than 120 percent of the applicable FMR as a reasonable accommodation for a person with a disability in accordance with 24 CFR part 8, after requesting and receiving HUD approval.

24 C.F.R. § 982.503(d)(5).

Plaintiff notes that he sought an exception payment standard above 120%. Am. Compl. ECF 3, ¶¶ 6, 7 [Doc. No. 6-1]. Under both the regulation and statute, to receive approval, SHA would need to submit a request to HUD. Here, Plaintiff avers that SHA never submitted such a request. Id. at ECF 3, ¶ 7 ("SHA did not provide a proper disability based reasonable accommodation requests to HUD Boston[.]"). Accordingly, where Plaintiff alleges that HUD did not receive a request from SHA to adjudicate, any injury Plaintiff experienced cannot be traced to HUD.[3] And HUD did not violate either the statute or regulation by failing to act on a request it never received.

Separately, Plaintiff contends that HUD contributed to his injury because HUD is allegedly required under the HCV Program to oversee SHA and that HUD failed to do so when it did not intervene to remedy SHA's alleged violations. Pl.'s Mem. in Opp'n ¶ 2 [Doc. No. 26]. This argument is unsuccessful.

Plaintiff first argues that the HCV Program Guidebook establishes that "[i]f HUD has reason to question the PHA's system or the accuracy of the determination, HUD may require the PHA to conduct rent reasonableness reviews on all or a portion of its units." Id.; Def.'s Opp'n to Pl.'s Emergency Mot. for Prelim. Inj. Ex. B, ECF 3 [Doc. No. 23-2]. Accordingly, Plaintiff asserts that HUD in this context should have intervened and rejected SHA's determination. Pl.'s Mem. in Opp'n ¶ 6 [Doc. No. 26] ("The above are reasons for HUD Boston to intervene into the matter[.]"). HUD maintains that this language "refers to HUD's role carrying out an oversight

---

[3] Likewise, to the extent that Plaintiff alleges HUD "engaged in malicious (harmful) disability discrimination against" Plaintiff, Amended Complaint ECF 7, ¶ 33 [Doc. No. 6-1], the court reiterates that, having not been presented with a request by SHA, HUD could not have approved a reasonable accommodation above 120%.

function in addressing any systemic errors." Def.'s Reply 3 [Doc. No. 30]. Further, HUD notes that it "does not review, provide oversight over, or second-guess PHA determinations of whether individual housing units are rent reasonable or not." Id.  The policy's text does not support Plaintiff's reading. The text establishes that the agency may conduct oversight if it has concerns about the PHA's system not individual determinations, nor does the text suggest that HUD was required to act in this particular instance.

Finally, Plaintiff relies on 24 CFR § 982.1(a)(1) to suggest that because the regulation notes the program is "generally administered by State or local governmental entities called public housing agencies[,]" that HUD is "falsely argu[ing] that SHA has complete autonomy over such matters." Pl.'s Mem. in Opp'n ¶¶ 5–6 [Doc. No. 26]. As HUD explains, this "regulatory language does not refer to HUD administering the HCV program[,]" but describes the possibility that other entities aside from PHAs may administer the HCV Program, such as non-profit organizations. Def.'s Reply 4 [Doc. No. 30]. The court agrees that the regulatory scheme does not suggest that HUD is required to intervene in particular decisions made by a PHA. Accordingly, where HUD was under no obligation to intervene in SHA's decision making, Plaintiff's injuries are not traceable to HUD and Plaintiff lacks standing to bring the claims in his First Amended Complaint [Doc. No. 6-1] as to HUD.

      A.     *Plaintiff's Motion for Leave to File a Second Amended Complaint*

Plaintiff's proposed second amended complaint introduces no new allegations that would establish that Plaintiff has standing to bring suit against HUD. In the proposed complaint Plaintiff alleges that HUD misrepresented the requirements of 24 CFR 982.507(b)(1)(2) and indicated that it approved of SHA's administration of the regulation. Mot. for Leave to File a Second Am. Compl. ¶ 2 [Doc. No. 63]. Yet, even if this were true, Plaintiff still does not allege

13

that HUD received a request from SHA regarding Plaintiff's reasonable accommodation request. Indeed, Plaintiff again notes in the proposed complaint:

> Regarding my Disability Reasonable Accommodation Request for 140% approval (and a request for above 140% is possible), both of which SHA accurately stated can only be done by HUD, but which has to first be submitted by SHA to HUD, SHA declined to submit my 140% request to HUD stating that neither unit is Rent Reasonable; and HUD stated to me that they only receive such Disability Reasonable Accommodation Requests if SHA first finds that that the units are Rent Reasonable; and HUD added that they accepted SHA's finding the units to not be Rent Reasonable.

Id. ¶ 6 (emphasis added). These allegations further reinforce that any injury was not fairly traceable to HUD. Plaintiff also cites to no authority that suggests HUD could have reviewed SHA's determination that the units were not rent reasonable. Any amendment to Plaintiff's Amended Complaint [Doc. No. 6-1] with respect to Plaintiff's case against HUD would therefore be futile. Accordingly, the court denied Plaintiff's motion to amend as to HUD. See Electronic Order [Doc. No. 76].

### V.   Conclusion

Plaintiff has not alleged an injury that is fairly traceable to actions by Defendant HUD. Nor does his proposed Second Amended Complaint allege a traceable injury. Accordingly, Plaintiff lacks standing to bring the First Amended Complaint or the proposed Second Amended Complaint against HUD. For these reasons, the court granted Defendant HUD's Motion to Dismiss [Doc. No. 21] and denied, as to HUD, Plaintiff's Motion for Leave to File a Second Amended Complaint [Doc. No. 63].

IT IS SO ORDERED.

February 6, 2026                           /s/ Indira Talwani
                                           United States District Judge